In re James & Leilani ROSSOW, Debtor.

Bankruptcy No. 91–13400 K.

United States Bankruptcy Court, W.D. New York.

March 5, 1992.

Kenneth R. Hiller, Jeffrey Freedman Attorneys at Law, Buffalo, N.Y., for debtor.

Morris L. Horwitz, Horwitz and Frankel, Tonawanda, N.Y., for Unit No. 1 Federal Credit Union.

## INTRODUCTION

MICHAEL J. KAPLAN, Bankruptcy Judge.

A creditor partially secured by a lien on a 1990 Pontiac Grand Am has objected to confirmation of the Debtors' Chapter 13 Plan on the grounds that although the Plan does propose to pay the creditor the present "value" of the vehicle over time, the value proposed to be paid is less than the full retail value of the car as a used vehicle.

At hearing at the Niagara Falls term of Court on February 20, 1992, the Court confirmed the Plan subject to amendment, if necessary, in accordance with the resolution of this dispute.

No testimony has been taken. The matter has been submitted on papers which include certain stipulated appraisal figures. (Although the creditor's brief purports to attach the appraisals, it does not.) The values reached for this vehicle are these: The debtor scheduled it at the estimated value of $7250.00; the Standing Chapter 13 Trustee valued it at $6825.00; the creditor's appraiser assigned an "actual Cash Value" of $8500.00; and the debtor's appraiser assigned a "Fair Market Value" of $8500.00 and a "Liquidation Value" of $7650.00.

## BACKGROUND

Being a new Judge, I have asked the Standing Chapter 13 Trustee to describe the procedure used for valuation of autos in the thousands of Chapter 13 cases per year in which he serves. His response is attached. [Appendix A] I have also asked the only active Bankruptcy Judge of the District who was on the Bench when this

system was devised, Chief Bankruptcy Judge Beryl E. McGuire, to outline the understanding reached some 20 years ago in consultation with representatives of the auto finance industry and others, which gave rise to the system. His response is also attached. [Appendix B]

The controversy herein appears to arise out of the fact that the 1990 Pontiac has been "appraised," by both the creditor and the debtor, at values higher than that derived in accordance with the procedure as outlined by the Chapter 13 Trustee's memo.

Although it is not entirely clear what the Court is being asked to rule on in this case,[1] I will characterize the matter as follows:

When the value of a car is to be based upon a published regional guide (whether the value is taken from the guide without appraisal, or whether there is an appraisal which employs guide value as a baseline), does 11 U.S.C. § 1325(a)(5)(B)(ii) command use of published average "trade-in" or "wholesale" value, or does it command use of published average "retail" value, as the starting point?

So characterizing the issue before the Court, I hold that no evidence has been offered to establish that "trade-in" or "wholesale" values, after adjustment for mileage, optional equipment, condition, etc., (but without a subtractive for the cost of repossession and sale) should not be accorded treatment as prima facie evidence of the value commanded by 11 U.S.C. § 1325(a)(5)(B)(ii).

## ANALYSIS

The creditor's Brief states that "the parties have stipulated that the fair market value is $8,500.00 while the liquidation value is $7,650.00." Thus the brief suggests: "The proper standard of valuation becomes the issue presented to the Court."

If the parties have stipulated as to the "fair market value," then they have stipulated to permit appraisers to reach legal conclusions, and there is no issue before this Court now. I will, however, proceed to address my characterization of the papers before me, as enunciated above.

■ Appraised values are simply that— "appraised values." I need no briefs or argument to conclude that "fair market value" is the appropriate "value" to use under § 1325(a)(5)(B)(ii), but I may not be bound by a stipulation that $8,500.00 becomes the "fair market value" merely because an appraiser so labels the appraisal without supporting explanation.

I am not convinced that NADA average trade-in value is *not* "fair market value" when referring to a typical automobile.

I am similarly not convinced that once one subtracts dealer profit and costs of value added by the dealer (such as new tires), from a "retail" price, one does not end up at what an appraiser might call "liquidation value," but what NADA or "Red Book" or similar guide might call "average trade-in" or "wholesale" value.

Hence, unless it is argued that the creditor is entitled to what a dealer would get for the car (including profit and the costs of value-added), it may be that "fair market value," "liquidation value," "trade-in value," "actual cash value" and "wholesale value" are all the same. I am offered no evidence upon which any findings could be made in this regard.

Moreover, even if I were to rule that the creditor is entitled to what it would cost the debtor to replace the vehicle, this would not mean "retail" value. If I were to suffer the repossession of, for example, a 1985 Mercury Cougar LS by the lender, it would likely have some infirmities, but could presumably be "wholesaled" for $2500 (the January 1992 NADA Guide "trade-in" value). At retail I would have to pay $3475 to "replace" it (according to NADA), but my "replacement" would likely have fewer infirmities, would be cleaner, might have new tires and perhaps even a brief warranty or an option to buy a warranty. If I wanted to truly "replace" it, infirmity-by-infirmity,

1. It may be that I am asked to choose, without any foundation whatsoever, among (1) two stipulated appraised values ($8500 and $7500), and

(2) one value ($6825) computed in the Trustee's normal manner, and (3) the $7250 value scheduled by the debtor.

I would go to the auto auction and buy a true replacement, presumably for not much more than $2500.00.[2] The creditor who repossessed might "net" *less* than $2500.00.

Thus it may be that "replacement value" is also equivalent to "fair market value," "wholesale value," "trade-in value," "actual cash value" or "liquidation value."

But this might not be true, as a factual matter. I am offered no evidence either way.

As a legal matter the creditor makes much of *United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), asserting that that case somehow changed the standard in its favor. The Ninth Circuit has rejected this notion.[3] I believe it has correctly done so. *Timbers* stands for the proposition that an undersecured creditor with a lien on real estate is not entitled to "adequate protection" of the use-value of the proceeds of its collateral, i.e. "interest" or "lost-opportunity costs." It seems rather incongruous to suggest that a case in which it is held that the Code does not protect the profits which an undersecured creditor might earn from wise investment of the cash of which it is being denied use, somehow also demands that an undersecured auto financer who is being denied possession of the vehicle is entitled to the opportunity to improve the vehicle or otherwise command the *profit* potential implicit in a "retail" valuation of an automobile.[4] Indeed it might be said (though I do not now hold) that *Timbers* raises question as to whether even a car financer who is a car *dealer* (and who therefore might very well have contemplated a future retail sale as part of the bargained-for exchange) would be entitled to such valuation.

**CONCLUSION**

The stipulated appraisals that have been offered, without explanation, to represent the appropriate value of the 1990 Pontiac Grand Am are not sufficient to overcome the prima facie evidence of value derived from making proper adjustments to the NADA "average trade-in" figure.

However, I am not certain that the debtor has not already stipulated to a higher figure in this case, as opposed to merely stipulating as to what the appraisers would testify if called.

I also do not know whether the decision of the parties to submit this matter on papers manifests an agreement not to offer further evidence in this dispute.

Consequently, this matter is placed back on the Court's calendar at Niagara Falls on March 19, 1992, at 10:30 a.m. for report.

SO ORDERED.

**APPENDIX A**

**MEMORANDUM**

TO: Michael J. Kaplan U.S. Bankruptcy Judge

FROM: Albert J. Mogavero Chapter 13 Trustee

RE: Valuation of Motor Vehicles

The Court has requested advice as to the process by which the Chapter 13 Trustee values motor vehicles at meetings of creditors for subsequent submission to, and approval by, the Court.

The primary valuation tool is the *NADA Official Used Car Guide* which sets forth values for most major American and foreign vehicles up to eight years of age.

Three values are given for used vehicles: average loan, average trade-in and average

---

**2.** It is true that a typical debtor in a case before this Court likely cannot borrow the cash needed to buy at auction. But surely a creditor cannot be entitled to a premium valuation of its collateral based upon the debtor's lack of wherewithal to replace it.

**3.** *In re Mitchell*, 954 F.2d 557 (1992).

**4.** *In re Balbus*, 933 F.2d 246 (4th Cir.1991) and *In re Bellamy* 122 B.R. 856 (Bkrtcy.D.Conn. 1991), cited by the creditor, stand for the proposition that hypothetical costs of sale are not to be deducted in valuing the undersecured creditor's claim, for certain purposes. As indicated above, the Trustee does not deduct the costs of repossession and sale from "Trade-in" value. Thus, his procedure accords with those cases.

retail. The loan value is the lowest and the retail is the highest.

By accepted practice sanctioned by both Judges McGuire and Creahan, it has been determined that the Trustee should utilize the average trade-in value for a particular vehicle and that the month for valuation should be the month of *filing*, even though technically the month in which the 341 meeting is held might be more appropriate. I believe it was felt that the earlier month would give an "added break" to the creditor.

Once the Trustee has determined the average trade-in, the debtor's testimony is taken as to condition and mileage. Deductions are made for collision and mechanical problems and then additions or subtractions are computed based on the mileage tables in the front of the NADA book. (It should be noted that on occasion the value may be further modified by inclusion of premiums for disability and/or life insurance for which the debtor contracted at the time of purchase and which he is given the option of accepting or rejecting at the 341 meeting.)

It has not been my practice to go over the list of options on a vehicle since quite often it is simply a game of chance, i.e. the value may be increased by certain options but then decreased for failure to have such extras as automatic transmission, power steering and air conditioning. If, however, the creditor secured by the vehicle is present and requests that the list of options be run, then I cover every option both those favorable to the creditor and those that might reduce value as well.

Once the value has thus been reached, it is my practice to ask the debtor—and the creditor when present—whether the value is satisfactory. If it is not satisfactory to either party, the reason for the difference is discussed and, if possible, a compromise value reached. If no compromise can be found, the "book value" is placed on the Trustee's Report and the matter referred to the Court for final determination.

At the Confirmation Hearing the value is submitted to the Court as part of the Trustee's Report and, if accepted by the Court, entered on the subsequent Order of Confirmation as the secured value of the particular claim.

Sometimes, as the Court knows, a creditor requests additional time to obtain an appraisal. In such instances the customary practice has been for the plan to be confirmed if otherwise acceptable and for the question of the valuation alone to be held in abeyance pending appraisal. The appraisal is then usually discussed between creditor and debtor's attorney, and I am subsequently advised of the agreed-upon value. If the value varies from the original valuation at the 341 meeting, an Amended Order of Confirmation is submitted—either immediately upon receipt of the written agreed value or after a report has been made to the Court in the case where the question of valuation was continued to a subsequent calendar.

I think that the foregoing sets forth the basic method of valuation used in my office. If clarification or further information is desired, I am at the Court's disposal.

AJM:ps

February 26, 1992

## APPENDIX B

TO: HON. MICHAEL J. KAPLAN
FROM: HON. BERYL E. McGUIRE
RE: VALUATION OF AUTOMOBILES IN CHAPTER 13 CASES.
DATED: MARCH 3, 1992

Since the inception of the Chapter 13 program some twenty years ago, it has been the practice of Chapter 13 Trustees, creditors, and debtors alike to use the NADA Office Used Car Guide (Eastern Edition) as a basic authoritative source for estimating the fair market value of an automobile. The general use of that source, however, does not preclude the trustee, the debtor, or a creditor from challenging its reliability as a guide as to a particular auto.

The booklet is published monthly and provides three values for the various years, makes, and models of automobiles. Those values are:

"AVERAGE RETAIL," which is defined as: the "[l]atest average retail values based on actual sales reports from new and used car dealers throughout the region for which the Guide is designated."

"AVERAGE LOAN" which is defined as: the dollar value which "... represents the average amount of credit that may be obtained on vehicles sold at or near the average listed value."

"AVERAGE TRADE IN OR WHOLE-SALE" which is defined as: the "[l]atest average wholesale values based on auction reports and dealer wholesale reports throughout the region for which the Guide is designated."

At the outset of the Chapter 13 program, as might be expected, the question arose as to which of the above three values was most appropriate as a rule and guide for these cases. It may be noted that the average retail figure will always be the highest, the average loan value the lowest, and the average trade in or wholesale an in-between figure. For the past twenty years most debtors and creditors have accepted the latter figure as that which most closely approximates the fair market value of vehicles.

I believe that to be the case not because it is a "compromise" figure but because the so-called "average trade in or wholesale" figure most closely approximates what a sophisticated, knowledgeable buyer would pay and what a sophisticated, knowledgeable seller would accept for a given automobile.

As I understand it, most auto auctions are open to all who can demonstrate the financial responsibility required for bidding. Thus, it is only the lack of such financing or a lack of knowledge that keeps most persons interested in buying a used auto from participating in this market. Additionally, it is important to note that this value is far from a liquidation value; it does not take into account such items as repossession, storage, detailing, or auctioneering expenses.

On the other hand, the "Average Retail" value is just what it is defined to be. This would appear to be an unreliable guide to the actual value of a car because it adds to true value such items as dealer profit, the cost of value added (new or newer tires, for example), and repairs, carrying, and warranty costs.

Conversely, the average loan figure, I would think, discounts actual value by all of the costs and vagaries inherent in the liquidation process itself (such as those noted above in the discussion of the "Average Trade In or Wholesale" value).

Hence, while I do not purport to be an expert on this subject, the above sums up my understanding of why, on balance, the so-called average trade in or wholesale value has enjoyed such long-standing and wide acceptance by all parties to Chapter 13 cases.