**In re Pamela D. JACKSON, Debtor.**

No. 06–21044.

United States Bankruptcy Court, W.D. New York.

Jan. 10, 2007.

562

George M. Reiber, Esq., Rochester, NY, for trustee.

Bonnie S. Baker, Esq., Deily, Mooney & Glastetter, LLP, Albany, NY, Attorneys for HSBC Auto Finance.

## DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### BACKGROUND

On June 20, 2006, Pamela D. Jackson (the "Debtor") filed a petition initiating a Chapter 13 case (the "Jackson Case"), and George M. Reiber, Esq. (the "Trustee") was appointed as her Chapter 13 Trustee.

The Debtor filed a Chapter 13 Plan which provided, pursuant to Section 506(a)(1),[1] that the claim of HSBC Auto Finance, FKA Household Automotive Finance Corporation ("HSBC"), secured by a 2004 Ford Explorer (the "Explorer"), was to be treated as an allowed secured claim in the amount of $15,000.00, representing what the Debtor alleged to be the retail value of the Explorer, with the balance of the amounts due HSBC in connection with the Debtor's May 21, 2004 purchase of the Explorer to be allowed as an unsecured claim.[2] The allowed secured claim of $15,000.00 was to be paid with interest, in equal monthly installments through the Plan.

The Debtor's Chapter 13 Plan did not explain the reasons why it proposed a "cram-down" or "bifurcation" treatment of the HSBC Secured Claim, pursuant to Section 506(a)(1), rather than a treatment pursuant to that portion of Section 1325(a)(9) that has become known as the "Hanging Paragraph," since the Explorer was purchased within 910 days of the date of the filing of the Debtor's petition. The Hanging Paragraph in Section 1325(a)(9) provides that:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred with the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

On August 8, 2006, HSBC filed an objection to the Debtor's Chapter 13 Plan be-

---

1. Section 506 provides, in part, that:

    (a) (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

    11 U.S.C. § 506 (2006).

2. On July 10, 2006, HSBC filed a secured claim (the "HSBC Secured Claim") in the amount of $27,084.23. This would result in a $12,084.23 unsecured claim under the Debtor's proposed Section 506(a)(1) plan treatment.

cause it did not provide for the HSBC Secured Claim to be paid in full in accordance with the Section 1325(a)(9) Hanging Paragraph.

On August 30, 2006, the Trustee filed a Motion (the "Valuation Motion") which requested that the Court, pursuant to Section 506(a)(1), determine that HSBC had an allowed secured claim for the $15,000.00 retail value of the Explorer and an unsecured claim for the balance of the HSBC Secured Claim. The Valuation Motion asserted that: (1) the Debtor purchased the used Explorer on May 21, 2004 for her personal use from Auto Depot USA ("Auto Depot"), which was within 910 days of the filing of her petition; (2) in connection with her purchase, the Debtor traded in a 2001 Jeep Grand Cherokee (the "Jeep"), which was valued at $19,391.00 in the "Retail Installment Contract" [3] she entered into with Auto Depot; (3) at the time the Debtor traded in the Jeep, it was subject to a lien in favor of Triad Financial ("Triad") that was owed $19,391.00; (4) the May 2004 NADA Guide indicated that the Jeep had a trade-in value of $17,150.00; (5) the Retail Installment Contract indicated that the cash price for the Explorer was $30,545.00, even though the May 2004 NADA Guide indicated that the manufacturer's suggested retail price for a new Explorer, rather than the used Explorer the Debtor purchased, was $20,425.00; (6) the combination of the marked-up trade-in allowance for the Jeep and the marked-up sale price for the Explorer indicated that the Debtor had substantial negative equity in the Jeep that was refinanced as one of the transactions evidenced by the Retail Installment Contract so that the amount due to Triad could be paid and a lien release obtained; (7) although the Retail Installment contract granted the holder a security interest in the Explorer for the entire amount financed, because the HSBC Secured Claim included rolled-in and refinanced debt, HSBC did not have a purchase money security interest for that portion of the debt, and, therefore, for all of the debt included in the HSBC Secured Claim, as specifically required by the Section 1325(a)(9) Hanging Paragraph; and (8) because HSBC had a purchase money security interest for only a portion and not all of the debt included in the HSBC Secured Claim, the exception set forth in the Section 1325(a)(9) Hanging Paragraph did not apply, and the HSBC Secured Claim was subject to the cram-down and bifurcation provisions of Section 506(a)(1).

On and after September 12, 2006, HSBC filed a number of pleadings in opposition to the Valuation Motion, including a memorandum of law (collectively, the "HSBC Brief"), and on October 24, 2006, the Trustee filed a Reply Brief.

The Trustee filed similar valuation motions in other Chapter 13 cases involving secured claims filed by a number of other motor vehicle financers (these creditors, along with HSBC, will be referred to collectively as the "Motor Vehicle Finance Group").[4]

---

3. The Retail Installment Contract was later assigned to HSBC.

4. The Trustee initially filed objections to confirmation in the cases where he believed that because of the roll-in and refinance of negative equity, the Section 1325(a)(9) Hanging Paragraph did not apply, even though the respective debtor's plan provided for treatment of the secured claim under the Section 1325(a)(9) Hanging Paragraph. It was at the Court's suggestion that the Trustee filed the valuation motions in order to insure that the respective members of the Motor Vehicle Finance Group received clear and detailed notice of the Trustee's position and so the motions could then be set down for consolidated oral arguments.

The Court conducted hearings on September 13, 2006 and November 15, 2006 at which time it heard the oral arguments of the Trustee and attorneys for a number of the Motor Vehicle Finance Group, including the attorneys for HSBC.

On December 22, 2006, the Court issued a Decision & Order in *In re Peaslee*, 358 B.R. 545, 2006 WL 3759476 (Bkrtcy. W.D.N.Y.2006) (*"Peaslee"*). In *Peaslee*, a copy of which is attached the Court found that Section 506(a)(1), rather than the Section 1325(a)(9) Hanging Paragraph, governs the treatment of the secured claim of a motor vehicle financer, even though the debtor has purchased a replacement motor vehicle within 910 days of the filing of their petition for personal use, where: (1) it is shown that the secured claim includes amounts loaned to the debtor to pay off the debtor's negative equity in a trade-in vehicle, not to pay any part of the actual purchase price of the replacement vehicle, so that not all of the debt included in the secured claim is secured by a purchase money security interest; and (2) the Court, on all of the facts and circumstances presented in these refinancing of negative equity cases, in the exercise of its discretion, as specifically provided for by Section 9–103(h) of the New York Uniform Commercial Code, determined that a transformation rather than a dual status rule would be in the best interests of all of the parties and the Bankruptcy System.[5]

**5.** The Court anticipates that there will be cases coming before it where the applicable retail installment contract does not include debt for refinancing negative equity, but it does include debt that was not for any part of the actual purchase price of the replacement vehicle or an expense specifically enumerated in or similar to those specifically enumerated in Comment 3 to Section 9–103 of the New York Uniform Commercial Code ("Section 9–103"). In those cases, depending upon the

## DISCUSSION

### I. Burden to Demonstrate that the Motor Vehicle Financer's Secured Claim Includes Amounts Loaned to the Debtor to Refinance Negative Equity in a Trade–In Vehicle

In *Peaslee*, the parties did not dispute that at least $5,980.00 of negative equity had been refinanced as part of the two separate financial transactions evidenced by the applicable retail installment contract, because the contract itself indicated the refinancing of that amount of negative equity.

In a case where the applicable retail installment contract itself indicates that negative equity has been refinanced, a debtor that proposes a Section 506(a)(1) treatment for the secured claim of a motor vehicle in their Chapter 13 plan, or a trustee, unsecured creditor or other party in interest in that debtor's Chapter 13 case,[6] will have met their burden to demonstrate that the motor vehicle financer's secured claim includes debt that is not secured by a purchase money security interest, as specifically required by the Section 1325(a)(9) Hanging Paragraph.

In other cases, it is the initial burden of the debtor or other party in interest, including the Chapter 13 trustee or an

expense or the nature of the debt involved, this Court (the Rochester Division of the Western District of New York) may determine that a dual status rather than a transformation rule would be in the best interests of all of the parties and the Bankruptcy System.

**6.** The Court expects that such a creditor or other party in interest will have attended the debtor's Section 341 Meeting of Creditors, or otherwise have performed reasonable due diligence regarding the refinancing of negative equity.

unsecured creditor that would be negatively impacted by the improper treatment of a motor vehicle financer's secured claim pursuant to Section 1325(a)(9) Hanging Paragraph, rather than pursuant to Section 506(a)(1), to demonstrate that the secured claim includes debt for refinanced negative equity.

In these refinancing of negative equity cases, the party bearing the initial burden to demonstrate that negative equity has been refinanced must only demonstrate that there is at least one dollar ($1.00) of negative equity that has been refinanced. It is not necessary to demonstrate the actual amount of the negative equity refinanced.[7]

■ When parties contest valuation, this Court does not allow NADA Guide values to serve as the final evidence of the value of a motor vehicle when determining replacement value, retail value or liquidation value. However, for these refinancing of negative equity cases, the Court will permit the debtor, trustee, creditor or other interested party to utilize the appropriate NADA Guide values to meet their initial burden of proof as to the trade-in value of a trade-in vehicle, retail value of a used replacement vehicle, or manufacturer's suggested retail price of a new replacement vehicle.[8]

■ In this case, this Court finds that the Trustee has met his initial burden of proof to demonstrate to the Court's satisfaction that the two separate financial transactions evidenced by the applicable Retail Installment Contract included the separate transaction where Auto Depot loaned the Debtor money to refinance the negative equity she had in the Jeep for the following reasons:

1. Auto Depot gave the Debtor a $19,391.00 allowance for the Jeep, exactly the amount necessary to pay off the Triad loan, even though the NADA Guide trade-in value for the Jeep was only $17,150.00;

2. Even though the $19,391.00 allowance for the Jeep may have been within the range of the values that resulted in the NADA Guide trade-in value of $17,150.00, the Debtor paid more than $30,000.00 for the used Explorer replacement vehicle that had a manufacturer's suggested retail price of approximately $20,000.00 for a new Explorer; and

3. The overall price paid by the Debtor for the used Explorer indicates that the Debtor in fact had significant negative equity in the Jeep, beyond the roughly $2,000.00 difference between the NADA Guide trade-in value of $17,150.00 and the allowance of $19,391.00.

Notwithstanding that the Court may determine that an interested party using NADA Guide values may have met their initial burden of proof to demonstrate the refinancing of negative equity, the motor vehicle financer always retains the right to demonstrate that in fact no negative equity in the trade-in vehicle was refinanced, and to request a hearing for the Court to make that determination. The financer could accomplish this, among other ways, by

---

**7.** This is consistent with the many cases under Section 1322(b)(2) that permit a Chapter 13 debtor to: (1) eliminate the lien of a totally unsecured mortgage on their residence; and (2) treat the claim of that mortgage holder as unsecured. In those cases, a debtor can eliminate such a mortgage if they can demonstrate that the amounts due on superior liens against the residence exceed its value by only one dollar ($1.00). See *In re Pond*, 252 F.3d 122 (2d Cir.2001).

**8.** See *In Re Rossow*, 147 B.R. 1 (Bankr. W.D.N.Y.1992).

demonstrating the actual values of the trade-in and/or the replacement vehicle.[9]

## II. Retail Value for Purposes of Section 506(a)(1)

In *Peaslee*, the Court proceeded on the understanding that GMAC did not dispute the $10,950.00 alleged retail value for the Grand Am. However, in this case the Court is not aware that HSBC has agreed to the alleged $15,000.00 retail value for the Explorer.

In these refinancing of negative equity cases, the motor vehicle financer always retains the right to dispute the alleged retail value for the vehicle, and to request a hearing for the Court to determine the actual retail value.

## III. The Administration of Negative Equity Refinancing Cases Pending Appeal and Going Forward

It is this Court's anticipation that it will be presented with and enter a limited stay order (the "Peaslee Stay Order") in the Peaslee Case, which will have general applicability to all present and future refinancing of negative equity cases until the appeal of the Peaslee Case has been finally determined.

The Peaslee Stay Order would include provisions similar to the following: (1) once the retail value of the motor vehicle in question has been determined for purposes of Section 506(a)(1), the trustee will pay that retail value along with a *Till* rate of interest to the motor vehicle financer secured creditor; (2) the trustee will es-crow (the "Peaslee Escrow") the difference between the Section 506(a)(1) payment to the motor vehicle financer secured creditor and the payment the secured creditor would have received if its claim were treated under the Section 1325(a)(9) Hanging Paragraph, until the appeal of the Peaslee Case is finally determined; (3) when the appeal of the Peaslee Case is finally determined, the Trustee shall distribute the Peaslee Escrow either to the motor vehicle financer secured creditor or the Debtor's unsecured creditors, in accordance with *Peaslee*, or a different decision by the United States District Court for the Western District of New York or the United States Court of Appeals for the Second Circuit.

The Court will make the Peaslee Stay Order applicable to all other refinancing of negative equity cases currently on reserve, but it anticipates that for subsequent cases, the interested parties will make the provisions of the Peaslee Stay Order applicable by a stipulation that will be included in the confirmation order.

In future refinancing of negative equity cases, these issues will be addressed in connection with timely objections to confirmation, not valuation motions.

## CONCLUSION

Subject to the right of HSBC to request a hearing by January 22, 2007 on the issues of whether negative equity was refinanced or to determine the retail value of the Explorer, for the reasons set forth in

---

**9.** As the Trustee pointed out in *Peaslee*, motor vehicle retail installment contracts employ many manipulations that may make it difficult at first to see that negative equity was refinanced, especially when various rebates and discounts are included. The Court is unclear as to why these manipulations are employed. These manipulations are not required to comply with the requirements of the New York Motor Vehicle Retail Installment Sales Act ("MVRISA") or the Federal Truth–In–Lending Act ("TILA"), which define those various terms like "cash sale price" and specifically allow the inclusion of refinanced negative equity. It may be nothing more than to make the consumer feel like they made a good deal.

*Peaslee*[10] and in this Decision & Order, pursuant to Section 506(a)(1), HSBC shall have an allowed secured claim of $15,000.00, reduced by any payments received in the Jackson Case, to be paid in equal monthly payments together with the applicable *Till* rate of interest, to be set forth in the Confirmation Order presented to the Court by the Trustee, and an unsecured claim for $12,084.23.

**IT IS SO ORDERED.**

---

**10.** The position and principal arguments of HSBC, asserted in the HSBC Brief and presented at oral argument, were addressed in *Peaslee.*