**In re Jeremy W. FREEMAN, Debtor.**

No. 06–20798.

United States Bankruptcy Court, W.D. New York.

March 1, 2007.

---

Mark E. Lewis, Buffalo, NY, for Debtor.

George M. Reiber, Rochester, NY, trustee.

### DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### *BACKGROUND*

On May 17, 2006, Jeremy W. Freeman (the "Debtor") filed a petition initiating a Chapter 13 case, and George M. Reiber, Esq. (the "Trustee") was appointed as his Chapter 13 Trustee.

The Debtor filed a Chapter 13 Plan (the "Plan") which provided, pursuant to that portion of Section 1325(a)(9) that has become known as the "Hanging Paragraph, that the claim of Bank of America, N.A." ("Bank of America"), secured by a 2005 Ford Focus (the "Focus"), was to be treated as an allowed secured claim in the amount of $16,286.00. This amount represented the amount the Debtor believed was due on the "Retail Installment Contract" he entered into when he purchased the Focus, even though the Debtor's schedules indicated that he believed that the retail value of the Focus was only $8,825.00. The Plan further provided that the allowed secured claim of $16,286.00 was to be paid with interest, in equal monthly installments through the Plan.[1]

On August 24, 2006, the Trustee filed a Motion (the "Valuation Motion") which re-

---

1. On July 21, 2006, Bank of America filed a secured claim (the "Bank of America Secured Claim") in the amount of $16,660.11.

quested that the Court, pursuant to Section 506(a)(1), determine that Bank of America had an allowed secured claim for the $11,150.00 August NADA Guide retail value of the Focus and an unsecured claim for the $5,510.00 balance of the Bank of America Secured Claim. The Valuation Motion asserted that: (1) the Debtor purchased the new Focus on May 25, 2005 for his personal use from Cortese Ford ("Cortese Ford"), which was within 910 days of the filing of his petition; (2) in connection with his purchase, he traded in a 2003 Dodge Dakota (the "Dakota"), which was valued at $17,800.00 on the Retail Installment Contract entered into by the parties[2]; (3) at the time he traded in the Dakota, it was subject to a lien in favor of Bank of America that was owed $17,074.00; (4) the May 2005 NADA Guide indicated that the Dakota had a trade-in value of between $8,975.00 and $12,975.00; (5) the Retail Installment Contract indicated that the cash price for the Focus was $21,780.00, even though the July 2005 NADA Guide indicated that the manufacturer's suggested retail price for a new Focus was only $13,005.00; (6) the combination of the marked-up trade-in allowance for the Dakota and the marked-up sale price for the new Focus indicated that the Debtor had substantial negative equity in the Dakota that was refinanced as one of the transactions evidenced by the Retail Installment Contract so that the amount due Bank of America could be paid and a lien release obtained; (7) although the Retail Installment Contract granted the holder a security interest in the Focus for the entire amount financed, because the Bank of America Secured Claim included rolled-in and refinanced debt, Bank of America did not have a purchase money security interest for that portion of the debt, and, therefore, for all of the debt included in the Bank of America Secured Claim, as specifically required by the Section 1325(a)(9) Hanging Paragraph; and (8) because Bank of America had a purchase money security interest for only a portion and not all of the debt included in the Bank of America Secured Claim, the exception set forth in the Section 1325(a)(9) Hanging Paragraph did not apply, and Bank of America Secured Claim was subject to the cram-down and bifurcation provisions of Section 506(a)(1).[3]

On September 15, 2006, Bank of America filed Opposition to the Valuation Motion.

The Trustee filed similar valuation motions in other Chapter 13 cases involving secured claims filed by a number of other motor vehicle financers (these creditors, along with Bank of America, will be referred to collectively as the "Motor Vehicle Finance Group").[4]

2. The Retail Installment Contract was later assigned to Bank of America.

3. Section 506 provides, in part, that:

(a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
11 U.S.C. § 506 (2006).

4. The Trustee initially filed objections to confirmation in the cases where he believed that because of the roll-in and refinance of negative equity, the Section 1325(a)(9) Hanging Paragraph did not apply, even though the respective debtor's plan provided for treatment of the secured claim under the Section

The Court conducted hearings on September 13, 2006 and November 15, 2006 at which time it heard the oral arguments of the Trustee and attorneys for a number of the Motor Vehicle Finance Group, including the attorneys for Bank of America.

On December 22, 2006, the Court issued a Decision & Order in *In re Peaslee*, 358 B.R. 545 (Bankr.W.D.N.Y.2006) (*"Peaslee"*). In *Peaslee,* a copy of which is attached▇ the Court found that Section 506(a)(1), rather than the Section 1325(a)(9) Hanging Paragraph, governs the treatment of the secured claim of a motor vehicle financer, even though the debtor has purchased a replacement motor vehicle within 910 days of the filing of their petition for personal use, where: (1) it is shown that the secured claim includes amounts loaned to the debtor to pay off the debtor's negative equity in a trade-in vehicle, not to pay any part of the actual purchase price of the replacement vehicle, so that not all of the debt included in the secured claim is secured by a purchase money security interest; and (2) the Court, on all of the facts and circumstances presented in these refinancing of negative equity cases, in the exercise of its discretion, as specifically provided for by Section 9–103(h) of the New York Uniform Commercial Code, determined that a transformation rather than a dual status rule would be in the best interests of all of the parties and the Bankruptcy System.

On January 10, 2007, the Court issued a Decision & Order in *In re Jackson*, 358 B.R. 560 (Bankr.W.D.N.Y.2007) (*"Jack-*

*son"*). In *Jackson,* a copy of which is attached,▇ the Court found that: (1) where the applicable retail installment contract did not itself indicate that negative equity had been refinanced, any interested party objecting to a motor vehicle financer's secured claim receiving treatment under that Section 1325(a)(9) Hanging Paragraph had the initial burden to demonstrate that the secured claim included debt that was not secured by a purchase money security interest; (2) the objecting party could utilize the appropriate NADA Guide value to meet their initial burden of proof as to the trade-in value of a trade-in vehicle, the retail value of a used replacement vehicle, or manufacturer's suggested retail price of a new replacement vehicle; (3) notwithstanding a determination by the Court that an interested party using NADA Guide values may have met their initial burden of proof to demonstrate the refinancing of negative equity, so that a motor vehicle financer's secured claim included debt that was not secured by a purchase money security interest, the motor vehicle financer always retained the right to demonstrate that in fact no negative equity in the trade-in vehicle was refinanced and to request a hearing for the Court to make that determination; and (4) in the event that the Court determined that the allowed secured claim of a motor vehicle financer was to be treated under Section 506(a)(1), the motor vehicle financer always retained the right to dispute any alleged retail value for the vehicle in question, and to request a hearing for the Court to determine the actual retail value.[5]

---

1325(a)(9) Hanging Paragraph. It was at the Court's suggestion that the Trustee filed the valuation motions in order to insure that the respective members of the Motor Vehicle Finance Group received clear and detailed notice of the Trustee's position and so the motions could then be set down for consolidated oral arguments.

**5.** These findings, numbered (3) and (4), were Court's determinations in the ten other cases it had on *Jackson* were decided, including this case. *Jackson* al future these refinancing of negative equity cases primarily to address the reserve when *Peaslee* and so indicated that in the would be addressed in connection with objections to confirmation when any response

## DISCUSSION

In this case, this Court finds that the Trustee has met his initial burden of proof to demonstrate to the Court's satisfaction that the two separate financial transactions evidenced by the applicable Retail Installment Contract included the separate transaction where Cortese Ford loaned the Debtor money to refinance the negative equity he had in the Dakota for the following reasons:

1. Cortese Ford gave the Debtor a $17,800.00 allowance for the Dakota, even though the NADA Guide trade-in value for the Dakota was at most $12,975.00;

2. Even though the $17,800.00 allowance for the Dakota may have been within the range of the values that resulted in the upper level NADA Guide trade-in value of $12,975.00, although that seems unlikely, the Debtor paid more than $17,900.00 for the Focus replacement vehicle that had a manufacturer's suggested retail price of approximately $13,005.00; and

3. The overall price paid by the Debtor for the Focus indicates that he in fact had significant negative equity in the Dakota.

## CONCLUSION

Subject to the right of Bank of America to request a hearing by March 12, 2007 on the issues of whether negative equity was refinanced or to determine the retail value of the Focus, for the reasons set forth in *Peaslee*[6] and *Jackson*, pursuant to Section 506(a)(1), Bank of America shall have an allowed secured claim of $11,150.00, reduced by any payments received in the Freeman Case, to be paid in equal monthly payments together with the applicable *Till* rate of interest, to be set forth in the Confirmation Order presented to the Court by the Trustee, and an unsecured claim for $5,510.00.

**IT IS SO ORDERED.**

---

by a motor vehicle financer should address whether it requests a hearing on negative equity or retail value.

**6.** The position and principal arguments asserted by Bank of America were addressed in *Peaslee.*